**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **JANICE HANNON,** | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
|   vs. | ) |
| | ) CAUSE NO. 1:12-cv-00992-WTL-TAB |
| **UNUM LIFE INSURANCE COMPANY OF** | ) |
| **AMERICA and PITT COUNTY MEMORIAL** | ) |
| **HOSPIAL, INC. GROUP LTD PLAN,** | ) |
| | ) |
|    **Defendants.** | ) |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are the parties' cross-motions for summary judgment (dkt. nos. 36, 37). The motions are fully briefed, and the Court, being duly advised, **DENIES** the Defendants' motion and **GRANTS** the Plaintiff's motion for the reasons and to the extent set forth below.[1]

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

---

[1] Hannon's motion for oral argument regarding her motion for summary judgment (dkt. no. 42) is **DENIED**.

that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56. When evaluating each side's motion, the Court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro Life. Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## II. BACKGROUND

### A. The Parties and the Long-Term Disability Plan

Defendant Unum Life Insurance Company of America ("Unum") is an insurance company located in Maine but doing business in Indiana. Unum issued an insurance policy—the Pitt County Memorial Hospital, Inc. Group Long Term Disability Plan ("the Plan")—to eligible employees at Pitt County Memorial Hospital, located in North Carolina. The Plan provides financial protection to eligible participants by paying a portion of their income should they become disabled. Unum provides that a participant is disabled when:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
- After 36 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

2

UNUM defines "gainful occupation" as an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work.

The Plan also provides when benefits will be terminated:

- during the first 36 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to;
- after 36 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;
- the end of the maximum period of payment;
- the date you are no longer disabled under the terms of the plan;
- the date you fail to submit proof of continuing disability;
- the date your disability earnings exceed the amount allowable under the plan; or
- the date you die.

The Plan grants Unum sole discretionary authority to make all benefit determinations, both as to eligibility and termination.

Plaintiff Janice Hannon began working as a registered nurse at Pitt County Memorial Hospital in July 1998. In September 2000, Hannon began experiencing joint pain and, as a result, started to miss work. She was subsequently diagnosed with Ehler-Danlos syndrome, a disorder that affects the connective tissues, primarily the skin, joints, and blood vessel walls.[2] Eventually, she cut her hours back such that she was only working part-time; however, her condition worsened, causing her to be considered disabled pursuant to the terms of the Plan in December 2000.

## B. The Claims Process

---

[2] Ehler-Danlos syndrome is "an inherited disorder of connective tissue with several clinical forms characterized especially by extremely flexible joints, elastic skin, and excessive bruising[.]" Merriam-Webster Medical Dictionary, http://www.merriam-webster.com/ medical/ ehlers-danlos%20syndrome.

3

Hannon filed a claim with Unum on March 20, 2001, for long-term disability benefits. Unum approved her claim on August 9, 2001, finding she was limited from performing the material and substantial duties of her regular occupation due to her disorder, and that she was entitled to long-term disability benefits beginning on April 8, 2001.  Hannon received $1869.19 per month in disability benefits from Unum.

Around December 2004, Hannon left North Carolina and relocated to Indiana.  In March 2008, Hannon began working as a part-time seamstress for the Booth Tarkington Civic Theatre, located in Indianapolis, Indiana.  Her supervisor at the theatre provided her with a flexible schedule to accommodate her disability.  Hannon's duties included sewing and renting costumes as well as handling related paperwork; she worked approximately twenty hours per week, earning ten dollars per hour.  She submitted her monthly earnings to Unum and Unum continued to pay her disability benefits, as her earnings were below its 60% requirement.

Due to Hannon obtaining this part-time job, Unum began a review of her file to see if she still qualified for long-term disability benefits.  At Unum's request, Dr. John Fitzgerald, Hannon's pain management specialist, complete a detailed questionnaire regarding her functionality in December 2008.  Dr. Fitzgerald stated Hannon could not do any heaving lifting and could not sit or stand for any prolonged period of time; he noted that she needed to take frequent breaks.  He opined that she was only capable of sitting for four hours throughout the day.  In February 2009, Virginia Reynolds, a registered nurse, conducted a clinical review of her file at Unum's request, concluding Hannon was limited to part-time work.  Nurse Reynolds, however, disagreed with Hannon's doctors who concluded she could only sit for four hours per day, concluding that Hannon's condition did not rise to a level that limited sitting to only four hours per day.

In June 2009, Dr. Stewart Russell, an Unum employee, reviewed Hannon's file, finding no medical support for the conclusion that her restrictions and limitations ("R&Ls") prevented her from full-time sedentary work. He concluded that her R&Ls were overly restrictive. He also noted that Hannon responded positively to cortisone injections, and that her condition had been improving since 2001. He concluded that she would be able to perform an occupation that primarily required sitting. In July 2009, Dr. James Bress, another Unum employee, performed a review of Hannon's file and agreed with Dr. Russell's conclusions. Due to these findings, Unum referred Hannon's file to a vocational expert ("VE") in July 2011. The VE identified several gainful occupations Hannon would be capable of performing. After conducting these reviews, Unum still continued to pay Hannon long-term disability benefits in both 2009 and 2010.

In August 2011, Unum sent a field representative to meet with Hannon to discuss her claim. Hannon confirmed her part-time employment, stating she usually worked three to five hours at a time. She also discussed what a typical day was like for her, and reiterated that she still experienced fatigue, lack of stamina, side effects of her medications, and pain in her back and right knee. In October 2011, Dr. Russell performed another medical review of Hannon's file, concluding that her R&Ls provided by her pain management specialists were overly restrictive. Dr. Bress reviewed Hannon's file again in November 2011 and agreed with Dr. Russell. The VE performed another review of Hannon's file and identified two occupations available to Hannon: a human resources clerk and an eligibility worker.

On November 18, 2011, Unum terminated Hannon's disability benefits, concluding that the current information in her file no longer supported a disabling medical condition that prevented her from performing the duties of alternative gainful occupations. Hannon appealed this termination decision on March 30, 2012. Unum thus began another review of Hannon's

5

claim by a specialist and medical doctor, both of whom were not involved in making the initial termination decision. Dr. Scott Norris, the medical doctor assigned to review Hannon's file on appeal, questioned her diagnosis of Ehlers-Danlos syndrome, found that Hannon had osteoarthritis in her right knee, and noted that she engaged in activities that indicated a sustained sedentary work capacity. In May 2012, a VE identified two additional occupations Hannon was qualified for and could perform: a dispatcher and a routing clerk. Unum ultimately decided to uphold its termination decision and denied Hannon's appeal on June 1, 2012.

Hannon thus filed this lawsuit on July 19, 2012. She seeks reinstatement of her disability benefits from November 2011 as well as prejudgment interest on the back benefits. In addition, as an employee of Pitt County Memorial Hospital, Hannon also received a life insurance policy. On January 31, 2002, due to her disability, Unum approved Hannon's waiver of premiums for her life insurance policy. Unum continued to approve this waiver until her disability benefits were terminated. Therefore, Hannon also seeks reinstatement of the waiver of premiums for her life insurance policy.

### C. Hannon's Relevant Medical History

Hannon was diagnosed with Ehlers-Danlos syndrome in 1996, although she has experienced joint pain since her teenage years. Hannon began seeing Dr. John Mansoor, a rheumatologist, in April 1997 due to her condition. Throughout 2000 and 2001, she received consistent treatment at the Healtheast Outer Banks Medical Center, located in North Carolina, where she was treated by Dr. Mitch Jenkins for joint and back pain. Dr. Jenkins reported that Hannon's condition was worsening and diagnosed her with progressive joint disease and chronic pain. He referred her to the rheumatology division at Duke University.

Hannon continued to treat with Dr. Jenkins, who prescribed her various medications to treat her chronic pain in her knee, hands, and feet throughout 2001. She began receiving injections at this time in her right knee due to her pain. Dr. Jenkins completed a questionnaire from Unum in September 2001 regarding Hannon's functional capacity. He opined that Hannon was limited to four hours of sedentary work due to her severe, chronic pain. He also stated that her functional status would worsen.

In August 2001, Hannon saw Dr. Robert B. Hansen, a pain management specialist at the Center for Pain Management, whom she consistently saw throughout 2001, 2002, and 2003, for joint pain, stiffness, aching, and low back pain. In February 2002, Dr. Jenkins completed another Unum questionnaire opining that Hannon would only be able to withstand a maximum of four hours of sedentary activity per day. He also indicated he did not expect any significant change in her abilities.

In July 2002, Hannon saw Dr. R. Michael Graham for an evaluation of her right ankle, and she subsequently had ankle surgery in September 2002. Dr. Jenkins completed another Unum questionnaire in February 2003, again finding that Hannon was limited to a maximum of four hours of sedentary work and stating that her condition continued to worsen. In April 2003, Hannon saw Dr. Joan Helena Rose, a surgeon, for an evaluation of her right thumb. She had reconstructive surgery performed in July 2003. In February 2004, Hannon received more steroid injections from Dr. Hansen to treat her low back pain. In April 2004, Dr. Hansen opined in another Unum questionnaire that Hannon was unable to work and her condition would continue to worsen.

When Hannon moved to Indianapolis, Indiana, in December 2004, she began treatment at the Raphael Health Center, where she began seeing Dr. Louis Winternheimer for loose joints,

7

chronic pain, and arthritis. Dr. Winternheimer completed an Unum questionnaire in December 2005, opining that Hannon was disabled due to her Ehler-Danlos syndrome and its complications. Hannon continued seeing Dr. Winternheimer throughout 2006 for chronic pain.

In August 2006, Hannon began seeing Dr. Edward J. Kowlowitz at the Center for Pain Management. He diagnosed Hannon with Ehlers-Danlos syndrome, lumber spondylosis,[3] and right knee enthesiopathy[4] and ordered MRIs of Hannon's right knee and lumbar spine, which revealed osteoarthritis.

Dr. Winternheimer completed another Unum questionnaire in September 2007, concluding Hannon was disabled and could not return to work. She had an echocardiogram performed in October 2007 that revealed mild mitral regurgitation.[5] She underwent two more MRIs on her knee and lumbar spine, revealing osteoarthritis and mild degenerative disc disease with mild spinal stenosis.[6]

In December 2008, Dr. Fitzgerald, one of her pain management specialists, completed a detailed questionnaire for Unum regarding Hannon's functionality. He concluded that she was only capable of two hours of sedentary work per day and did not expect her functional capabilities to improve.

---

[3] "Spondylosis refers to degeneration of the spine." http://www.spine-health.com/conditions/lower-back-pain/spondylosis-what-it-actually-means. Lumbar spondylosis occurs in the lower back. *Id*.

[4] Enthesiopathy is "acute or chronic inflammation at insertion of tendon or ligament into periosteum and underlying bone, characterized by local pain and/or swelling[.]" http://medical-dictionary.thefreedictionary.com/enthesiopathy.

[5] "Mitral valve regurgitation—or mitral regurgitation—happens when your heart's mitral valve doesn't close tightly, which allows blood to flow backward in your heart." http://www.mayoclinic.com/health/mitral-valve-regurgitation/DS00421.

[6] "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often in the neck and lower back." http://www.mayoclinic.com/health/spinal-stenosis/DS00515.

Hannon continued to receive corticosteroid injections as well as other treatment from both Drs. Kowlowitz and Fitzgerald throughout 2009 and 2010 for her low back, neck, and knee pains. From May through December 2010, Hannon underwent several procedures to help alleviate some of her low back pain, including cervical and medial branch blocks,[7] lumbar and thoracic radiofrequency facet denervations,[8] and a lumbar radiofrequency rhizotomy.[9] Dr. Kowlowitz completed a statement regarding her functional capacity for Unum in March 2011, stating that her restrictions were permanent.

In August 2011, Dr. Kowlowitz completed a statement regarding Hannon's functional capacity, concluding that she could perform no more than four hours of sedentary work and opining that her capacities would never to improve. Throughout 2011 and 2012, Hannon continued to see Drs. Kowlowitz and Fitzgerald due to her chronic pain. She underwent a lumbar radiofrequency rhizotomy, knee injections, and a medial branch block all in 2011. Dr. Kowlowitz completed a statement about her medical condition on March 28, 2012, noting her Ehers-Danlos diagnosis. He concluded that due to her pain, she was disabled under Unum's definition of disability. He opined that she could not work full-time and her prognosis for recovery was poor. He anticipated her disability to be permanent and continuous.

### III.   DISCUSSION

---

[7] "A medial branch nerve block is a procedure in which an anesthetic is injected near small medial nerves connected to a specific facet joint." http://www.spine-health.com/treatment/injections/medial-branch-nerve-blocks.

[8] "Radiofrequency facet denervation (RFD) is used to treat central neck or back pain caused by arthritis." http://www.ohsu.edu/xd/health/services/spine/getting-treatment/conditions-treatments/radiofrequencyfacetdenervation.cfm

[9] "Radiofrequency rhizotomy is a procedure that reduces or eliminates the pain from damaged facet or sacroiliac joints by disrupting the medical branch nerves that carry pain signals." Pl.'s Brief at 18, n. 9.

9

Hannon filed this action pursuant to the applicable provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, seeking the Court's review of the Defendants' decision to terminate her long-term disability benefits. The parties agree that it is appropriate for this Court to review the Defendants' decision under the arbitrary and capricious, or abuse of discretion, standard[10] because the Plan documents delegate discretionary authority to the plan administrator, Unum, to determine eligibility for benefits.

The arbitrary and capricious standard of review is deferential, of course, but it "is not a euphemism for a rubber-stamp." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009). The Seventh Circuit has explained that "arbitrary-and-capricious review turns on whether the plan administrator communicated 'specific reasons' for its determination to the claimant, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Id.* at 484 (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009)). In *Majeski*, the court explained that "a plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue." *Id.*

Hannon asserts that Unum's termination of her long-term disability benefits was an abuse of discretion, as was its appeal determination. Hannon also contends that there is a structural conflict of interest as to Unum's decision to terminate her benefits because they selectively

---

[10] "For ERISA purposes the arbitrary-and-capricious standard is synonymous with abuse of discretion." *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 767 n. 7 (7th Cir. 2010) (citations and quotation marks omitted).

reviewed her ten years of medical history, giving much weight to physicians' opinions who were employed by Unum. The Court will address each of these challenges in turn.

### A. Unum's Decision to Terminate Hannon's Long-Term Disability Benefits

Hannon does not argue that Unum failed to articulate its reasons for the denial of her claim. Rather, the crux of her argument is that Unum cherry-picked statements from her treating physicians that supported its decision to terminate her benefits, while ignoring the rest of her ten-year medical history that Unum previously used to conclude she was totally disabled. The Court agrees that there is some merit to Hannon's position.

Unum's initial termination decision contains about two pages of medical evidence, primarily from the years 2010 and 2011, which it claims supports its decision that Hannon is no longer disabled. It also contains non-medical evidence regarding Hannon's ability to perform basic household chores. The Court believes that Unum's initial termination decision was arbitrary and capricious with respect to both its selective review of her medical history as well as its treatment of her ability to perform basic household chores.

#### 1. Hannon's Medical Evidence

The Court agrees with Hannon that Unum failed to adequately address her full medical file. For example, Unum cites a report from Dr. Kowlowitz regarding Hannon's pain relief: "[r]ecently on March 1, 2011, Dr. Kowlowitz noted you were 51-75% better: 'General activity is better,' 'In addition participation in work and leisure activities are better.'" R. at 2251. On this same page, however, Dr. Kowlowitz notes the following:

> The low back pain has been occurring in a persistent pattern. The course has been constant. … The symptoms are aggravated by prolonged standing and prolonged sitting (and rotation).
>
> The neck pain has been occurring in a persistent pattern. … There have been no relieving factors.

> The onset of knee pain has been gradual and has been occurring for years. The course has been constant. The knee pain is moderate.

*Id.* Therefore, while Hannon has reported some temporary pain relief, her complete medical record clearly reveals that she regularly visits her pain management specialists and continues to report the same persistent low back, neck, and knee pains. *See* Pl.'s Response at 18 (indicating that Hannon had 30 appointments from May 24, 2010, to February 27, 2012, with her pain management specialists). Selecting one positive response does not negate the hundreds of pages in the medical record indicating Hannon's pain is continuing and disabling.

The next paragraph is equally as selective when discussing Hannon's low back pain. It notes that "[o]n July 21, 2011 Dr. Fitzgerald noted 'in no acute distress' with tenderness of the low back and decrease in range of motion." R. at 2551. This "in no acute distress" language was reported by Dr. Fitzgerald with respect to Hannon's general appearance, along with notes that Hannon was "[c]ooperative and [w]ell groomed." It is unclear to the Court why Unum chose to put a "general appearance" notation as support for its termination letter regarding her disability. Further, it is not entirely clear how one doctor noting on one particular date that Hannon was not in acute distress supports Unum's termination of benefits decision. Again, the record is replete with evidence that Hannon suffers from continuing low back pain and has had several procedures performed to help temporarily alleviate this pain. *See id.* at 2145-2198; 2329-2357; 2507-2523; 2628-2636; 2637-2643).

Finally, the termination letter states that on June 10, 2011, Hannon saw Dr. Winternheimer for her right knee pain and he noted that she appeared "to be tearful and 'quite upset out of proportion to circumstances.'" *Id.* at 2251. The full notation reveals that Hannon was "very upset about problems getting an appointment with me [Dr. Winternheimer]. [S]eems tearful and upset quite out of proportion to circumstances." *Id.* at 2652. Again, it is unclear to

12

the Court why Unum chose to quote this languge in its initial termination decision, as it is irrelevant to Unum's determination of disability benefit eligibility that Hannon was upset because she experienced trouble getting a doctor's appointment. There is no other evidence cited with respect to her knee pain other than the conclusory statement that it "would not preclude full time seated work activity." *Id*. at 2551.

The Court, therefore, agrees with Hannon that Unum acted arbitrarily in selecting only a few pieces of evidence that it believed supported its termination decision. Hannon's entire medical file is over 2,000 pages in length, documenting her troubles with Ehlers-Danlos syndrome and the accompanying chronic pain she has experienced for ten years. Selecting only a few snippets of Hannon's entire medical file and taking them out of context does not provide sufficient justification to terminate the long-term disability benefits that Unum paid continuously for ten years. In so doing, Unum abused its discretion in its initial termination decision.

In addition to her arguments above, Hannon also argues that Unum wrongly rejected her treating physicians' opinions and R&Ls, specifically those given by Drs. Fitzgerald and Kowlowitz. While Unum was not required to give any special deference to their opinions, it also was not allowed to "arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician." *Holmstrom*, 615 F.3d at 774-75. Both Dr. Fitzgerald and Dr. Kowlowitz had provided R&Ls for Hannon's Ehlers-Danlos syndrome in the past—Dr. Fitzgerald in December 2008 and Dr. Kowlowitz in August 2011. The termination decision notes an April 2010 report from both doctors that limited Hannon to four hours of sedentary activity, along with other limitations for lifting, prolonged walking and standing, and operating machinery.

13

Surprisingly, however, the termination letter does not further explain why Unum does not agree with these R&Ls given by her treating physicians.[11] In fact, the decision goes on to state, "[t]here is no evidence for restrictions or limitations related directly to this syndrome [Ehlers-Danlos]." R. at 2251. This is simply untrue. As noted above, Ehlers-Danlos syndrome is a condition that primarily affects connective tissue, skin, and joints, often leading to early-onset arthritis. Hannon's extensive medical file is replete with documentation of joint pain, including knee, back, and neck pain, all consistent with her Ehlers-Danlos diagnosis that has been confirmed by numerous doctors since 1996. It is curious to the Court why Unum chose at this point to question her diagnosis, given that it continuously paid her disability benefits for ten years due to this condition. In so doing, the Court finds that Unum acted arbitrarily.

The Defendants argue that "[c]ertainly, Unum should not be expected to defer to Dr. Kowlowitz and Dr. Fitzgerald when the totality of the evidence and the more analytical, thorough, and well-reasoned opinions were provided by the expert medical reviewers." Def. Response at 19. Unum is correct that it did not need to defer to Hannon's treating physicians; however, it did need to acknowledge their reports and articulate sufficient reasons for rejecting their opinions. Unum failed to do so and thus abused its discretion.

### 2. Other Evidence

In addition to selectively citing Hannon's medical file, Unum also erred in its analysis of Hannon's ability to perform basic household chores. In its termination of benefits letter it stated,

> [y]ou are currently working approximately 4 hours per day and after work you report able [sic] to do household chores including laundry, cleaning, cooking and

---

[11] The Court notes that in reviewing Hannon's file prior to its termination decision, Unum contacted Dr. Kowlowitz to better understand Hannon's functional capacity, but claims that he did not respond to their requests. R. at 2551. If true, this is unfortunate. This does not, however, excuse Unum's failure to explain why it rejected his previous reports completed in April 2010 and August 2011.

14

>vacuuming late at night. You are up until 2-3 AM. This personal activity in addition to working 4 hours per day is consistent with the ability to work at the seated activity level for a full 8-hour day with breaks allowed at least once per hour.

*Id*. at 2552. As Hannon notes, the Seventh Circuit has firmly stated that the "casual equating of household work to work in the labor market cannot stand." *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). There are vast differences between the ability to perform necessary household chores and the ability to withstand and sustain full-time employment, even at the sedentary level. The type of work is very different, as is the ability to take breaks if needed. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) ("And when one is working at home it is easier to interrupt one's work every few minutes if need be than to do so at the office."). The fact that Hannon washes her clothes, cooks herself dinner, and vacuums the carpet in her home certainly does not support the conclusion that she is able to work full-time. In fact, a closer review of the field report, from which this information came, reveals that Hannon's daughter often helps her perform these tasks, and that she takes frequent breaks when she needs to rest due to her pain. *See* R. at 2247 ("She stated that her daughter helped her clean her house, do the laundry, do heavy grocery shopping, and cooking [sic] meals. She stated that she takes her time doing these chores and rests when she feels tired.").

The Defendants argue that "this was merely one piece of evidence among many within Plaintiff's file" and that there was "no reason to have Unum ignore the information." Def. Response at 14. The Court agrees that Unum was under no obligation to ignore this evidence, and that it certainly should be factored into its termination decision. However, it appears from Unum's termination letter that this factor played an unreasonably large role in its ultimate conclusion that Hannon could sustain full-time work. *See* R. at 2552 ("This personal activity in addition to working 4 hours per day is consistent with the ability to work at the seated activity

level for a full 8-hour day with breaks allowed at least once per hour."). Coupled with the fact that Unum did not account for the help Hannon received in performing her household chores, the Court finds that Unum erred in relying so heavily on her ability to perform these household chores.

In sum, the Court believes that Unum abused its discretion in selectively choosing pieces of Hannon's medical file that supported its termination decision. It did not conduct a full review of her ten-year medical history, nor did it give equal weight to the evidence indicating Hannon's ongoing, debilitating pain. In addition, it reached an arbitrary conclusion that because Hannon could perform household chores in addition to working a few hours per day, she could work full-time. The Court agrees with Hannon that Unum abused its discretion in reaching its initial termination of benefits decision

### B. Unum's Decision to Uphold its Termination Decision on Appeal

In addition to her claim that Unum acted arbitrarily and capriciously in terminating her benefits, Hannon argues the same with regard to Unum's denial of her appeal. To that end, she makes four arguments. Her first argument is that Unum created a new basis for terminating her claim while denying her appeal which deprived her of a full and fair review. On appeal, Unum again questioned Hannon's diagnosis of Ehlers-Danlos stating that her file "does not contain any evidence that this diagnosis has been confirmed with genetic testing or collagen typing." R. at 2803. The Court disagrees, however, that Hannon was denied a full and fair review on her appeal because, as noted above, Unum questioned her Ehlers-Danlos diagnosis in its initial termination decision. It was not, therefore, a new basis for denying her appeal. The Court has adequately addressed its concerns regarding Unum's questioning of Hannon's diagnosis above, and thus, will not address this argument again with respect to her denial of her appeal.

16

Secondly, Hannon argues that she was denied an objective review of her appeal because Unum used its own physician to conduct the review of her file. This argument, however, is encompassed by her structural conflict of interest claim. Thus, the Court will not address it with respect to her appeal.

Hannon's next argument is similar to one she made above—that there was no evidence that her condition substantially improved. The Court believes there is some merit to this claim. Just as with initial benefits determinations, "arbitrary-and-capricious review [of an appeal determination] turns on whether the plan administrator communicated 'specific reasons' for its determination to the claim, whether the plan administrator afforded the claimant 'an opportunity for full and fair review,' and 'whether there is an absence of reasoning to support the plan administrator's determination.'" *Majeski*, 590 F.3d at 483; *see also Love*, 574 F.3d at 396-97 (applying the same standard to a Plan's initial determination and its appeal determination). While Unum's appeals decision is notably more detailed and thorough than the initial termination decision, the Court agrees that there are fatal flaws rendering Unum's decision to uphold its initial termination decision arbitrary.

In examining the appeals decision, it becomes clear that, once again, Unum selectively chose to cite certain pieces of evidence, taken out of context, that seemingly support its decision, while ignoring the remainder of Hannon's medical file. As the Defendants state in their brief, Unum denied Hannon's appeal because "[t]he medical records document consistent improvement in Plaintiff's pain symptoms and pain control through medial branch blocks and radiofrequency treatment that effectively controlled Plaintiff's pain for approximately a year at a time." Def. Response at 15. It is true that Hannon experienced temporary pain relief from the dozen or so procedures designed to alleviate her neck and back pain. *See, e.g.*, R. at 2195; 2197;

17

2193; 2189; 2191; 2160; 2181; 2183; 2333; 2512; 2647. However, it is still undisputed that between May 2010 and February 2012, Hannon saw her pain management specialists at least thirty times due to her persistent and debilitating low back, neck, and knee pains. Further, despite temporary pain relief from the numerous procedures, both Drs. Fitzgerald and Kowlowitz concluded that Hannon was disabled and unable to perform more than four hours of sedentary work at a time due to her chronic pain. Concluding that Hannon's "records show relative stability of her chronic pain symptoms" when the evidence reflects that Hannon continues to visit her pain management specialists on a monthly basis complaining of persistent pain is nothing short of arbitrary. *Id*. at 2803.

Finally, Hannon's last argument is that the appeals decision was arbitrary and capricious because it failed to discuss the vocational assessment of Michael Blankenship she submitted with her appeal. Blankenship interviewed Hannon and made essentially the same findings as her two treating physicians—that she cannot work full-time, even in a sedentary position. *See id*. at 2759-60. Inasmuch as Umum rejected her treating physicians' findings, the Court does not believe that its decision would have been different had it addressed Blankenship's report. Nevertheless, on remand, Unum should consider his report, and if it rejects it, explain why.

## C. The Appropriate Remedy

Hannon asks this Court to award her benefits directly rather than remanding for further proceedings. "When a plan administrator fails to provide adequate reasoning for its determination, [the] typical remedy is to remand to the plan administrator for further findings or explanations." *Majeski*, 590 F.3d at 484. A direct award of benefits is appropriate only in "the rare case where the record . . . contains such powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled." *Id*.

While Hannon has demonstrated that Unum acted arbitrarily and capriciously, the evidence in the record is not so powerfully persuasive that the only determination the plan administrator could reasonably make is that the claimant is disabled.  Accordingly, this case is remanded with the following instructions:

On remand, Unum should consider Hannon's subjective reports of temporary pain relief in conjunction with her monthly reports to her pain management specialists that her low back, neck, and knee pains are continuing in a persistent pattern.  Further, Unum should adequately address Blankenship's assessment of Hannon.  If it chooses to reject his report, it should explain its reasons why.

## IV.   CONCLUSION

Unum acted arbitrarily and capriciously in both initially terminating her long-term disability benefits as well as denying her appeal.[12]  For these reasons, the Defendants' motion for summary judgment is **DENIED**, and Hannon's motion for summary judgment is **GRANTED**.  This case is remanded for further proceedings consistent with this Entry.

SO ORDERED:  11/26/2013

*William T. Lawrence* (signature)

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication

---

[12] In light of this finding, the Court need not consider the parties' arguments regarding a structural conflict of interest. *See Raybourne v. Cigna Life Ins. Co.*, 576 F.3d 444, 450 (7th Cir. 2009) (conflict of interest "will tip the balance" in favor of claimant in borderline cases).